AARON KAUFMANN, SBN 148580
DAVID POGREL, SBN 203787
**LEONARD CARDER, LLP**
1330 Broadway, Suite 1450
Oakland, CA 94612
Telephone: (510) 272-0169
Facsimile:  (510) 272-0174
akaufmann@leonardcarder.com
dpogrel@leonardcarder.com

MICHAEL RUBIN, SBN 80618
JAMES M. FINBERG, SBN 114850
EVE CERVANTEZ, SBN 164709
MATTHEW J. MURRAY, SBN 271461
**ALTSHULER BERZON LLP**
177 Post Street, Suite 300
San Francisco, California  94108
Telephone:  (415) 421-7151
Facsimile:  (415) 362-8064
mrubin@altshulerberzon.com
jfinberg@altshulerberzon.com
ecervantez@altshulerberzon.com
mmurray@altshulerberzon.com

Attorneys for PLAINTIFFS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOHIT NARAYAN, HANNA RAHAWI, THOMAS HEATH and UGO IHEONU, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>EGL, INC., a Texas Corporation; CEVA Freight, LLC, a Delaware Corporation, and DOES 2-10, inclusive,<br><br>Defendants. | **CLASS ACTION**<br><br>No. C05-04181 RMW<br><br>**PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Date:   March 30, 2012<br>Time:  9:00 a.m.<br>Courtroom:  6 |

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................1

II.  ARGUMENT ....................................................................................................2

   A. Plaintiffs Meet The Numerosity Requirement.................................................2

   B. Plaintiffs Satisfy The Typicality Requirement. ..............................................2

   C. Plaintiffs Meet The Commonality And Predominance Requirements ...............3

      1. The Predominant Question Is Whether The Drivers Were Misclassified
        as Independent Contractors. .................................................................3

      2. The Right To Control Is Subject To Common Proof.............................3

      3. Entrepreneurial Opportunity Is Subject To Common Proof. .................5

      4. The Secondary Factors May Be Established Through Common Proof. ..........7

      5. Defendants Do Not Contest That Plaintiffs Have Satisfied
        Commonality and Predominance For Their Substantive Claims, So
        Long As The Misclassification Issue Can Be Decided On Common
        Proof, As It Can. ................................................................................10

   D. The Named Plaintiffs Are Adequate Representatives. ....................................10

      1. Some Drivers' Desire To Remain Independent Contractors Does Not
        Create A Conflict Of Interest Cognizable Under Rule 23(A)(4). . . . . . . . . . . 10

      2. The Antitrust Cases Relied Upon By Ceva Do Not Demonstrate Any
        Conflict Of Interest Here, Where Drivers' Uniform Misclassification
        As "Independent Contractors" Gives Rise To The Same Injuries And
        Remedies. ...........................................................................................13

      3. Plaintiffs' Damages Models Do Not Defeat Adequacy. ....................16

         a) Plaintiffs Propose Plausible Damages Models For Their Expense
          Reimbursement Claims That Will Fairly Compensate All Class
          Members. ......................................................................................16

         b) Plaintiffs' Choice Of Damages Models Does Not Create A
          Conflict. .......................................................................................21

   E. Class Treatment Of The Expense Reimbursement Claim Is Superior To
      Hundreds Of Individual Trials All Examining The Same Core Evidence
      Regarding Employment Status. ...........................................................23

III. CONCLUSION ................................................................................................25

i

TABLE OF AUTHORITIES

**FEDERAL CASES**

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group, L.P.*,
   247 F.R.D. 156 (C.D. Cal. 2007)......................................................................... 14

*Anderson v. Mt. Clemens Pottery Co.*,
   328 U.S. 680 (1946) ........................................................................................... 18

*Ansoumana v. Gristede's Operating Corp.*,
   201 F.R.D. 81 (S.D.N.Y. 2001) ......................................................................... 22

*Braintree Laboratories, Inc. v. McKesson Corp.*,
   2011 WL 5025096 (N.D. Cal. Oct. 20 2011) ..................................................... 14

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
   155 F.3d 331 (4th Cir. 1998) ............................................................................. 15

*Brzychnalski v. Unesco, Inc.*
   35 F. Supp.2d 351 (S.D.N.Y. 1999) .................................................................. 22

*Chakejian v. Equifax Information Servs.*,
   256 F.R.D. 492 (E.D. Pa. 2009) (FCRA) .......................................................... 22

*Chun-Hoon v. McKee Foods Corp.*,
   2006 WL 3093764 (N.D. Cal. Oct. 31, 2006) ..................................................... 9

*Dalton v. Lee Publications, Inc.*,
   270 F.R.D. 555 (S.D. Cal. 2010) ................................................................... 9, 15

*Gunnells v. Healthplan Servs., Inc.*,
   348 F.3d 417 (4th Cir. 2003) ............................................................................. 24

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ........................................................................... 24

*Harris v. Vector Marketing Corp.*,
   753 F.Supp.2d 996 (N.D. Cal. 2010) ............................................................24-25

*Hart v. Rick's Cabaret Int'l Inc.*,
   2010 WL 5297221 (S.D. N.Y. Dec. 20 2010) .................................................... 13

*In Re Conseco Life Ins. Co. Lifetrend Ins. Sales and Marketing Litigation*,
   270 F.R.D. 521 (N.D. Cal. 2010) ....................................................................... 22

*In re FedEx Ground Package System, Inc., Employment Practices Litigation*,
   273 F.R.D. 424 (N.D. Ind. 2008).................................................................5, 9, 16

*In re Wellbutrin SR Direct Purchaser Antitrust Litigation*,
   2008 WL 1946848 (E.D. Pa. May 2, 2008)........................................................ 14

*In re: Nassau County Strip Search Cases*,
   461 F.3d 219 (2nd Cir. 2006) ............................................................................ 24

**FEDERAL CASES** (cont'd)

*Kelecseny v. Chevron, U.S.A. Inc.,*
    262 F.R.D. 660 (S.D. Fla. 2009) ............................................................... 23

*Lerwill v. Inflight Motion Pictures,*
    582 F.2d 507 (1978) ........................................................... 11, 13, 16

*Li v. A Perfect Franchise, Inc.,*
    2011 WL 4635198 (N.D. Cal. Oct. 5, 2011) ........................................ 9

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    __ F.3d __, 2012 WL 592745 (7th Cir. Feb. 24, 2012) ....................... 24

*Meijer, Inc. v. Abbott Laboratories,*
    251 F.R.D. 431 (N.D. Cal. 2008) ...................................................... 14

*Meijer, Inc. v. Warner Chilcott Holdings Co., III, Ltd.,*
    246 F.R.D. 293 (D.D.C. 2007) ......................................................... 14

*Murray v. GMAC Mort. Corp.,*
    434 F.3d 948 (7th Cir. 2006) ........................................................... 22

*Narayan v. EGL, Inc.,*
    616 F.3d 895 (9th Cir. 2010) .................................................. *passim*

*Norris-Wilson v. Delta-T Group, Inc.,*
    2010 WL 3834886 (S.D. Cal. Sept. 30, 2010) ............................... 10, 11

*Palo Alto Town & Country Village, Inc. v. C.I.R.,*
    565 F.2d 1388 (9th Cir. 1977) ......................................................... 20

*Phelps v. 3PD, Inc.,*
    261 F.R.D. 548 (D. Or. 2009) .......................................................... 16

*Phillips v. Klassen,*
    502 F.2d 362 (D.C. Cir. 1974) ......................................................... 15

*Pickett v. Iowa Beef Processors,*
    209 F.3d 1276 (11th Cir. 2000) ....................................................... 14

*Ross v. RBS Citizens, N.A.,*
    667 F.3d 900 (7th Cir. Jan. 27, 2012) ................................................ 3

*S.G. Borello & Sons, Inc. v. Dep't. of Indus. Relations,*
    48 Cal.3d 341 (1989) ............................................................ *passim*

*Santa Cruz Transportation, Inc. v. Unemploy. Ins. Appeals Bd.,*
    235 Cal. App.3d 1363 (1991) ............................................................ 8

*Sepulveda v. Wal-Mart Stores, Inc.,*
    2011 WL 6882918 (9th Cir. Dec. 30, 2011) .................................... 25

*Sherman v. American Eagle Express, Inc.,*
    2012 WL 748400 (E.D. Pa. March 8, 2012) ...................................... 5

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

*Smith v. Cardinal Logistics Management Corp.*,
    2008 WL 4156364 (N.D. Cal. Sept. 5, 2008)........................................................ 7, 9, 11

*Soto v. Diakon Logistics (Delaware), Inc.*,
    2011 WL 3515917 (S.D. Cal. Aug. 10, 2011)............................................................... 7

*Spencer v. Beavex, Inc.*,
    2006 WL 6500597 (S.D. Cal. Dec. 15, 2006) ...................................................... *passim*

*Stemkowski v. C. I. R.*,
    690 F.2d 40 (2d Cir. 1982) .......................................................................................... 20

*Stuart v. RadioShack Corp.*,
    641 F.Supp.2d 901 (N.D. Cal. 2009) ........................................................................... 20

*Thompson v. American Tobacco Co., Inc.*,
    189 F.R.D. 544 (D. Minn. 1999) ................................................................................. 22

*Toyota Motor Sales U.S.A., Inc. v. Sup. Ct.*,
    220 Cal. App.3d 864 (1990) ......................................................................................... 4

*Valley Drug Co.  v. Geneva Pharmaceuticals, Inc.*,
    350 F.3d 1181 (11th Cir. 2003) ................................................................................... 14

*Wal-Mart Stores, Inc. v. Dukes*,
    __U.S.__, 131 S. Ct. 2541 (2011) .......................................................................... 3, 25

*White v. E-Loan, Inc.*,
    2006 WL 2411420 (N.D. Cal. Aug. 18, 2006) ............................................................ 22

*Yokoyama v. Midland Nat'l. Life Ins. Co.*,
    594 F.3d 1087 (9th Cir. 2010) ............................................................................... 24, 25

**STATE CASES**

*Estrada v. FedEx Ground Package Systems, Inc.*,
    154 Cal. App.4th 1, 14 (2007) ............................................................................... 16, 17

*Gattuso v. Harte-Hanks Shoppers, Inc.*,
    42 Cal.4th 554 (2007)............................................................................................ *passim*

*Grant v. Woods*,
    71 Cal. App.3d 647 (1977) ............................................................................................ 8

*Hernandez v. Mendoza*,
    199 Cal. App.3d 721 (1988) .................................................................................. 18, 23

**FEDERAL STATUTES AND RULES**

26 U.S.C. §162(a) ............................................................................................................ 20

2010-51 I.R.B. 883 §3.01 ................................................................................................ 18
2010-51 I.R.B. §4.02 ....................................................................................................... 18
2010-51 I.R.B. §4.04 ....................................................................................................... 18
2010-51 I.R.B. §4.05 ....................................................................................................... 18

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

**FEDERAL STATUTES AND RULES** (cont'd)

Fed. Rule Civ. Pro. 23 ..................................................................................*passim*

**CALIFORNIA STATUTE**

Cal. Labor Code
    §2802 ..........................................................................................*passim*

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

# I.   INTRODUCTION

Defendants CEVA Freight and EGL ("Company," or "CEVA") concede that the predominant question in this action is whether the pick-up and delivery drivers who worked under the uniform written agreement ("Drivers") were misclassified as independent contractors.  CEVA does not contest that, if this question can be answered with common evidence (as it can), then class certification is proper with respect to all of Plaintiffs' claims.

Plaintiffs have already demonstrated that the factors identified by the Ninth Circuit as material to CEVA's independent contractor defense are susceptible to common proof.  *See* Pls' Mem. of Pts and As in Support of Motion for Class Certification ("Mot.") at 22-25; *Narayan v. EGL, Inc.,* 616 F.3d 895 (9th Cir. 2010).  Rather than try to rebut this showing, CEVA focuses on two areas of alleged dissimilarities between the Drivers—neither of which are relevant to the class certification analysis because neither are probative of Drivers' employment status under California law.  CEVA argues that "[o]ne key dissimilarity is the extent to which CEVA's owner operators took advantage of entrepreneurial opportunities." Ds' Opp. to Motion for Class Certification ("Opp.") at 1.  Yet CEVA necessarily acknowledges that the applicable test under California law is "*opportunity* for profit and loss," not whether any particular worker actually took advantage of that opportunity.  Opp. at 25, n. 164.   Because all Drivers had the same "opportunity" for profit and loss, differences in the "extent" to which any such Drivers "took advantage" of such opportunities are irrelevant to classification.  Mot. at 25; *infra* at 5-7.

CEVA also argues that whether the class members' work is "usually done under CEVA's direction" will require individualized evidence.  Opp. at 2.  But under California law, a worker's "employee" status does not turn on whether the employer exercises "actual control," but whether the employer has the "right to control."  CEVA does not contest that the "right of control" question can be answered in this case on a class-wide basis, by examining the text of CEVA's Agreement with its Drivers and the company policies and procedures governing its authority to control its Drivers' work.  Mot. at 22-23; *infra* at 3-5.  Thus, common questions regarding the Drivers' misclassification as independent contractors necessarily predominate.

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

CEVA's attack on the Named Plaintiffs' adequacy as class representatives lacks merit as well. The alleged conflict posited by CEVA—that some Drivers may prefer to be paid as "independent contractors" even if they are treated as "employees"—is not a valid basis to deny class certification.  Mot. at 17-18, n. 121; *infra* at 10-12.  Whether CEVA is right that complying with its back pay obligations would lead it to abandon its current way of doing business, no employer has the right to misclassify its workers; and if CEVA chooses to classify its Drivers as independent contractors legally, it may do so—as long as it accords them the freedom from control that is the hallmark of an independent contractor. *Infra* at 10-12.

Finally, CEVA misstates both the facts and the law when it argues that Plaintiffs' damages models for their expense reimbursement claim defeat adequacy, predominance, and superiority. Controlling Ninth Circuit law forbids denial of class certification based on the potential need for individualized damages determination. *Infra* at 24.  Moreover, Plaintiffs have presented several viable damages models, including one based on actual expenses and others based on a mileage reimbursement rate that has been specifically approved by the California Supreme Court.  Both models seek full recovery, and neither is unduly complicated. *Infra* at 16-21.

## II.   ARGUMENT

### A.   Plaintiffs Meet The Numerosity Requirement.

Defendants do not contest Plaintiffs' numerosity. *See* Mot. at 16.

### B.   Plaintiffs Satisfy The Typicality Requirement.

Plaintiffs' opening brief established that the Plaintiffs are typical of other Drivers because they all personally performed the same types of pick-up and delivery services for CEVA under the same form Agreement, and, like all other Drivers, were denied business expense reimbursement, minimum wage, missed meal period wages, and overtime (for van drivers)—*i.e.*, they all suffered the same injuries. Mot. at 17.  Although CEVA mentions "typicality" in its brief (Opp. at 22-23), it does not contest this factual showing, or set forth any reasoned argument with respect to typicality.

C.   **Plaintiffs Meet The Commonality And Predominance Requirements.**

    1.   **The Predominant Question Is Whether The Drivers Were Misclassified as Independent Contractors.**

The "common answer" to whether the Drivers were Company employees "drives the resolution of this litigation."  *See Ross v. RBS Citizens, N.A.*, 667 F.3d 900, 909 (7th Cir. Jan. 27, 2012), citing *Wal-Mart Stores, Inc. v. Dukes*, ___U.S.___, 131 S. Ct. 2541, 2551 (2011).  Plaintiffs have already demonstrated that each of the factors that the Ninth Circuit found probative of employment status is susceptible to common proof.  Mot. at 22-25 (discussing primary "right to control" factor and all secondary factors, including right to discharge at will, whether work is integral to the work of the principal, whether Drivers are engaged in a distinct occupation requiring special skill, form of payment, ownership of the instrumentalities and place of work, degree of permanence in the relationship, and opportunity for profit and loss).  CEVA argues that there are factual differences in the extent to which individual Drivers took advantage of the opportunity for profit and loss, and in the Company's actual exercise of control over Drivers.  But for class certification, that does not matter, because the legal test focuses on the structural attributes of the employment relationship, and CEVA concedes that all of its drivers had the *same* opportunities for profit and loss and were subject to the *same* uniform agreement, policies, and procedures that give CEVA the *right* to control the Drivers' work.

    2.   **The Right To Control Is Subject To Common Proof.**

Plaintiffs have already demonstrated that CEVA's "right to control" its Drivers may be proved through the same type of common class-wide evidence that the Ninth Circuit cited in *Narayan,* 616 F.3d 895, in particular, the uniform Agreement signed by all Drivers and the Safety and Compliance Manual that governed all Drivers, as well as CEVA's class wide training, monitoring, and discipline systems.  Mot. at 22-23.  CEVA ignores this showing, and never refers to the Ninth Circuit's controlling decision in this case.  Instead, CEVA argues that allegedly "different experiences regarding the extent to which CEVA directs [Drivers'] work precludes a showing of commonality."  Opp. at 14:8-9.  But, as CEVA itself recognizes, the "critical inquiry" under California law is "whether the person to whom service is rendered has the *right* to control the

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

manner and means of accomplishing the result desired."  Opp. at 25:4-6, *quoting S.G. Borello & Sons, Inc. v. Dep't. of Indus. Relations,* 48 Cal. 3d 341, 350 (1989) (emphasis added). "[I]t is *not* the control *actually exercised*, but that which *may* be exercised which is determinative." *Toyota Motor Sales U.S.A., Inc. v. Sup. Ct.*, 220 Cal. App.3d 864, 875 (1990) (emphasis added).  In short, if CEVA has the same right of control over all class members, the misclassification issue can be decided on a class basis.

The alleged "differences" posited by CEVA are therefore not relevant to the certification decision.  For example, CEVA argues that some Drivers "turn down work with no adverse consequences" whereas others "do not refuse the regular work that they are offered."  Opp. at 15:8-10.  Maybe so.  But for purposes of determining whether a class member is an employee or an independent contractor, the relevant question is not whether CEVA required Drivers to accept every assignment offered, but whether under the parties' Agreement CEVA *could* enforce this requirement.  CEVA does not dispute that its policy was to present Drivers "with batches of deliveries that they generally had to accept as an all-or-nothing proposition" and that those who rejected a batch were to be dropped to the end of the dispatch list.  Mot. at 8:9-16, *quoting Narayan*, 616 F.3d at 902.  This gave CEVA the same "right to control" over all Drivers with respect to the ability to reject assignments.  Similarly, CEVA notes that some Drivers "choose how often to communicate with dispatch during the day," citing deposition testimony from particular drivers who allegedly "choose not to regularly communicate with CEVA during the day."  Opp. at 16:7-9.  Yet CEVA's corporate-issued training materials explicitly instructed Drivers to stay in close communication with dispatch throughout the workday, as the Ninth Circuit noted.  Mot. at 9:13-15.  Drivers were told:  "Communicating with dispatch is the single most important aspect of your job."[1]  This was a class-wide direction, from which a trier of fact could easily determine CEVA's *right* to control all communications with its Drivers.

As Plaintiffs have already demonstrated, many courts have certified classes in cases such as this, in which the *right* to control can be determined based on uniform contracts and/or policies and

---

[1] Dungan Decl. Ex. A-55 (Dkt. No. 198-6), Transcript of Eagle's Pickup and Delivery Video, 9:15-17.

procedures.  Mot. at 20:24-21:23, 22:16-26.  For example, in *In re FedEx Ground Package System, Inc., Employment Practices Litigation*, 273 F.R.D. 424 (N.D. Ind. 2008), the court granted class treatment where drivers' employment status focused on the "right of control" test, as it did for a class of California drivers asserting California Labor Code claims, *id.* at 458-59, but denied certification for other states where the test focused on how the control was actually exercised.  *See, e.g. id.* at 440-41; *see also Sherman v. American Eagle Express, Inc.*, 2012 WL 748400, *10-12 (E.D. Pa. March 8, 2012) (certifying claims where operative test was similar "right of control" inquiry but declining to certify claims based on "economic realities" test).  The class here should be certified because the primary factor for determining employment status—the right to control— may be determined by examining the uniform Agreement and the class-wide policies and procedures to which all Drivers were subject.

### 3. Entrepreneurial Opportunity Is Subject To Common Proof.

As demonstrated in Plaintiffs' opening brief, each of the secondary factors may also be determined based on common proof applicable to all Drivers (although, for class action purposes, common issues need only predominate for a substantial proportion of the case).  Mot. 24-25.  The issue of "entrepreneurial opportunity"—to which CEVA devotes much of its opposition, yet which warranted no mention in *Narayan*—unites rather than divides the class of Drivers, as underscored by key concessions made by CEVA.  CEVA describes at length how several of the Drivers whom it singled out for deposition often differed from the Named Plaintiffs in their use of sub-drivers and multiple vehicles.  However, CEVA offers little if any analysis as to why such differences matter under the employment status test required by *Narayan*.  They do not.  Rather, as even CEVA concedes, "it is the *opportunity* for profit and loss that is significant."  Opp. 25 n. 164.[2]  Because it was the Agreement that purported to grant the Drivers the right to use sub-drivers and select their

---

[2] For example, CEVA asserts that even if Plaintiff Thomas Heath, "who drove a single van and generated modest revenue, was misclassified" that would not mean CEVA also misclassified Jesus Estrada "who owns six tractors and has six subcontractors driving for him, generating substantial revenues."  Opp. at 24.  But CEVA does not explain why not.  If Mr. Heath were given the same "opportunity" to purchase additional trucks and add subcontractors under the Agreement, as he was, the fact that he did not do so makes no difference under the *Borello* factors, as described by the Ninth Circuit in *Narayan*.  In both cases, the Drivers had the same "opportunity" for profit and loss, constrained by the same uniform restrictions in the Agreement.

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

1   vehicles, all class members shared the same "opportunities." The Company concedes this point

2   too, "submit[ting] that significant entrepreneurial opportunities were available to *all* putative class

3   members." Opp. 1:8-10 (emphasis added). Because the relevant inquiry is whether the Drivers

4   had the *opportunity* for profit and loss, not the extent to which they took advantage of that

5   "opportunity," and because all Drivers enjoyed the same opportunities under the Agreement, this

6   "secondary" factor of the employment status test presents yet another common issue that can be

7   resolved on a class basis.[3]

8        The extent to which any "entrepreneurial opportunities" available to the Drivers were

9   "significant," under CEVA's view, is also subject to common proof, as the contours of the

10  opportunities were uniform under the Company's standardized restrictions. CEVA itself identifies

11  several "opportunities" that it necessarily concedes were offered to *all* Drivers—the opportunity to

12  use multiple vehicles; hire and fire sub-drivers and set their compensation; choose the model of the

13  trucks they drive; and work for other companies. Opp. at 3-13. Plaintiffs have similarly

14  established that these and other "opportunities" were subject to uniform restrictions, including:

15       (1)    The Company had the final say over Drivers' choice of sub-drivers and

16  could turn down any requested sub-driver (Mot. 12:13-16);[4]

17       (2)    Company permission was required before a Driver could add, or even
    substitute, a vehicle (Mot. 12:13-14);[5]

18

19       (3)    The Company expected all sub-drivers—like the Drivers—to abide by the
    same Company policies and procedures, (Mot. 13:6-7), and participate in the same

20  standardized orientation and training programs addressing those policies and
    procedures (Mot. 13:8-9);

21

22       (4)    Company dispatchers had the right to assign work directly to the sub-drivers,
    subject to the Company rules about declining work (Mot. 13:7-8);[6]

23  [3] If the Court finds otherwise, in an abundance of caution, Plaintiffs have proposed subclasses for
    Drivers with Sub-Drivers (roughly one-third of the class) and Drivers without Sub-Drivers. These

24  subclasses are readily ascertainable. *See* Bateman Decl. ¶¶3, 5 (identifying 396 Drivers total, and
    125 Drivers with Sub-Drivers).

25  [4] One Driver deposed by CEVA testified about having sub-drivers rejected by the Company and

26  having to wait over a year to gain Company approval. DeRobertis-Theye Decl. Ex. H,
    Cunningham 69:23-74:13.

27  [5] *See* Dkt. No. 173-6, at 47-8; DeRobertis-Theye Decl. Ex. M, Orellana 49:24-50:19.

28  [6] *See, e.g.*, DeRobertis-Theye Decl. Ex. L, Khan 33:3-34:8, 84:18-84:25.

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

(5)     Sub-drivers and Drivers alike were subject to the Company's centralized discipline regimen, including immediate termination (Mot. 13:9-11);[7]

(6)     All vehicles were subject to the Company's detailed requirements concerning model year, markings, appearance, repair, and maintenance (Mot. 8:1-8); and

(7)     The Company constrained the Drivers' ability to work for other companies by requiring Drivers to notify it before providing service to others and to remove or cover all CEVA logos before using their vehicle to provide service to another company (Mot. 13:12-14:4);[8]

The degree to which these CEVA-imposed limitations on the supposed "opportunities" for profit and loss undercuts CEVA's independent contractor defense is the same for all Drivers.[9]

### 4.  The Secondary Factors May Be Established Through Common Proof.

Many courts have certified independent contractor misclassification cases where the primary "right to control" factor and the majority of the secondary factors can be determined through class-wide common proof.  Mot. at 19-21.  Because that is also the case here, the class should be certified.  Rather than distinguishing these cases, CEVA mostly relies on a single unpublished decision, *Spencer v. Beavex, Inc.*, 2006 WL 6500597 (S.D. Cal. Dec. 15, 2006), in which the district court denied class certification in part because there were individualized questions with respect to one of the secondary *Borello* factors.[10]  That finding is arguably *dicta* as

---

[7] CEVA's deponents offered many examples of the Company ordering the firing, suspension, or other discipline of sub-drivers.  *See, e.g.,* DeRobertis-Theye Decl. Ex. E, Astudillo 76:2-19, 88:18-89:7; DeRobertis-Theye Decl. Ex. H, Cunningham 72:1-74:13; DeRobertis-Theye Decl. Ex. O, Ponce Guzman 63:16-25; DeRobertis-Theye Decl. Ex. J, Harris 32:1-33:20, 78:16-81:13; DeRobertis-Theye Decl. Ex. L, Khan 45:2-16, 85:1-87:21; DeRobertis-Theye Decl. Ex. M, Orellana 64:3-67:25, 68:1-69:6; DeRobertis-Theye Decl. Ex. N, Pereira 80:17-22; DeRobertis-Theye Decl. Ex. P, Rojas 76:5-77:18.

[8] See also DeRobertis-Theye Decl. Ex. Q, Slater 110:15-24 (drivers cannot carry freight for other customers while carrying freight for CEVA).

[9] CEVA's discussion of "entrepreneurial opportunities," ignores Plaintiffs' showing that CEVA uniformly controlled many other significant financial decisions regarding the Drivers' pick-up and delivery services, including all aspects of the customer relationship (Mot. 8:17-9:5), the Drivers' compensation (Mot. 14:10-15:2), purchase of several forms of insurance (Mot. 15:5-6), the selection of cellular and electronic communication providers (Mot. 15:6), and the use of CEVA forms and packing materials (Mot. 9:6-15).

[10] CEVA also cites *Soto v. Diakon Logistics (Delaware), Inc.*, 2011 WL 3515917 (S.D. Cal. Aug. 10, 2011) in which class certification was denied "without prejudice" because of concerns about the class definition and failure to sufficiently address earlier concerns the court had raised.  Opp.

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

the proposed class in *Spencer* was not ascertainable, which was itself sufficient to justify denying

class certification.  2006 WL 6500597, *9-10.

Moreover, here there are no secondary factors which require individualized inquiry.  Mot.

at 24-25.  Unlike in *Spencer*, here there is ample common evidence to establish whether the Drivers

were engaged in a "distinct occupation or business."  Courts considering the "distinct occupation"

factor often meld it with the question of whether "work is a part of the regular business of the

principal," as both factors encompass similar factual considerations.  *See Santa Cruz*

*Transportation, Inc. v. Unemploy. Ins. Appeals Bd.*, 235 Cal. App.3d 1363, 1372-77 (1991)

(finding taxi driver did not have distinct business and was integral to Yellow Cab's regular

business, where customers booked through Yellow Cab, taxis bore Yellow Cab's identity, and

Yellow Cab leased taxis to drivers); *Grant v. Woods*, 71 Cal. App.3d 647, 653 (1977) (newspaper

carriers working for newspaper distributor "were not involved in a separate and distinct occupation

of their own.  To the contrary, they were essential to Grant's business.").

Here, much of the common evidence that supported the Ninth Circuit's conclusion that the

Named Plaintiffs provided services that "were an essential part of the regular business of EGL,"

*Narayan,* 616 F.3d at 901, also supports a class-wide finding that Drivers did not operate a separate

business when they were personally performing delivery and pick-up services for CEVA's

customers.  All drivers—class members and sub-drivers alike—service CEVA's customers, wear

CEVA's uniform, drive CEVA-logoed vehicles, use CEVA's dispatch and freight tracking system

and forms, and are subject to significant CEVA-imposed restraints on servicing other customers,

among other things.  According to the CEVA's Executive V.P., CEVA has "significant advantages

. . . in the marketplace by having logo'd vehicles with a uniformed driver showing up," because it

gives "the appearance that . . . CEVA is monitoring that shipment, is responsible for the service

performance of that shipment." [11]  Indeed, CEVA itself acknowledged that Drivers "operate under

CEVA's DOT authority."[12]  The fact that some Drivers may also have worked at times for other

---

26:17-21.  That case offers no guidance here.

[11] DeRobertis-Theye Decl. Ex. Q, Slater 103:15-104:13.  *See also id.* 116:10-18.

[12] Decl. of Sam Slater ISO Defendant's Oppos. to Plaintiffs' Motion for Class Cert., 3:19.

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

1   companies, or hired sub-drivers to drive for other companies, does not transform them from

2   employees to independent contractors, any more than a law firm's secretary moonlighting for

3   another firm, or even operating her own independent trucking business, would cause her to cease

4   being an employee of the law firm.

5         In any event, the court in *Spencer* placed undue emphasis on "whether a given driver can be

6   said to be engaged in a business distinct from that of the Defendant," 2006 WL 6500597, *16.

7   Plaintiffs are aware of no other decision in which a court refused to certify a class in an

8   independent contractor misclassification case because of possible individual differences going to

9   the "distinct business" factor or any other of the "secondary" factors discussed in *Borello* and

10   *Narayan*.   Rather, courts mostly focus on the primary "right of control" factor when evaluating

11   class treatment, and have found predominance where the contours of the right of control is largely

12   defined in uniform contract terms.  *See, e.g., Li v. A Perfect Franchise, Inc.*, 2011 WL 4635198,

13   *12 (N.D. Cal. Oct. 5, 2011); *In Re Fed Ex,* 273 F.R.D. at 458-59; *Dalton v. Lee Publications, Inc.*,

14   270 F.R.D. 555, 562-63 (S.D. Cal. 2010).  Other courts in this judicial district and the Ninth Circuit

15   have generally rejected challenges to class certification based on variations in individual driver

16   operations and have granted class certification based upon strong common evidence going to more

17   probative factors of employment status.  *See, e.g., Smith v. Cardinal Logistics Management Corp.*,

18   2008 WL 4156364, *10 (N.D. Cal. Sept. 5, 2008) (common evidence of control trumped variations

19   in whether drivers had established own corporations, owned their own truck, or had their own

20   "operating authority" from the State); *Chun-Hoon v. McKee Foods Corp.*, 2006 WL 3093764, *5

21   (N.D. Cal. Oct. 31, 2006) ("variation in sales operation and the differences in the relationship

22   between each distributor and defendant does not bar certification").  Indeed, because of the

23   preeminence of the right-to-control and the right-to-fire factors, courts have certified classes even

24   while acknowledging that individual issues may arise as to some less important "secondary

25   factors." *See, e.g., Dalton*, 270 F.R.D. at 562-63 (certifying class although some secondary factors

26   required individual proof because "the more important element—the degree of Defendant's control

27   or lack thereof—is subject to common proof based on the uniform contracts" as was the right to

28

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

fire at will without cause); *Norris-Wilson v. Delta-T Group, Inc.,* 2010 WL 3834886, *12 (S.D. Cal. Sept. 30, 2010) (although individual differences may exist with respect to three of the seven secondary factors, the common proof of control and other secondary factors warranted class certification). Here there is common evidence of CEVA's right to control and to fire, plus *all* the most probative secondary factors discussed in *Narayan*.

### 5. Defendants Do Not Contest That Plaintiffs Have Satisfied Commonality and Predominance For Their Substantive Claims, So Long As The Misclassification Issue Can Be Decided On Common Proof, As It Can.

Plaintiffs established commonality and predominance for their substantive claims by demonstrating that all of CEVA's violations resulted from its uniform policies and practices with respect to deductions from settlement checks, failure to reimburse business expenses, wage statements, meal periods, minimum wage, and overtime. Each of those violations rests on the core predominant issue here—CEVA's misclassification of Drivers as independent contractors. Mot. at 27-30. CEVA does not contest this showing, or make any argument that Plaintiffs' substantive claims cannot be proven on a class-wide basis, so long as the Drivers' misclassification is subject to common proof.

### D. The Named Plaintiffs Are Adequate Representatives.

The Court should reject CEVA's challenge to the adequacy of the Named Plaintiffs, which rests on the supposed tension between Plaintiffs' claim to "employee" status for purposes of past wage and hour violations and some class members' theoretical preference to work as independent contractors in the future. Such potential conflicts do not defeat adequacy because: (1) an employee as defined by state law cannot acquiesce to being misclassified as an independent contractor; (2) CEVA can continue to classify Drivers as independent contractors legally if it provides them with the independence required by law; and (3) CEVA's prior misclassification results in similar wage and hour violations for all Drivers.

### 1. Some Drivers' Desire To Remain Independent Contractors Does Not Create A Conflict of Interest Cognizable Under Rule 23(a)(4).

Plaintiffs established in their opening brief that the hypothetical desire of some putative class members to remain classified as independent contractors cannot thwart Plaintiffs' and other

- 10 -

1   Drivers' efforts to enforce non-waivable rights under the California Labor Code.  *See* Mot. 17-18 n.

2   121.  CEVA does not even try to distinguish the authority cited by Plaintiffs, in which courts ruled

3   that desire to maintain an unlawful labor scheme does not create the type of conflict of interest that

4   defeats adequacy under Federal Rule of Civil Procedure 23(a)(4).  *See Smith v. Cardinal Logistics*,

5   2008 WL 4156364, *7 (some drivers' desire to remain independent contractors does not raise a

6   sufficient conflict of interest to overcome the adequacy of plaintiffs seeking employment status

7   under California's worker protection laws); *Norris-Wilson,* 270 F.R.D. at 606 ("Rule 23(a)(4) is

8   concerned about…conflicts between the class representatives and other members of the putative

9   class, not between those who do and don't think a lawsuit is a good idea in the first place").  *See*

10  *also Li*, 2011 WL 4635198, *9 ("The fact that . . . some potential class members may prefer their

11  current employment situation, is not sufficient to defeat adequacy.");  *Lerwill v. Inflight Motion*

12  *Pictures*, 582 F.2d 507, 512 n.4 (1978) (noting "substantial question whether employees can be

13  deemed to oppose rights which … are mandated by statute").

14          CEVA's threat that it could discard its current independent contractor model should

15  Plaintiffs prevail does not help its conflict argument, as the specter of some change in business

16  operations in the future rests on a mischaracterization of Plaintiffs' liability theory and the relevant

17  facts, as well as gross speculation.  This lawsuit does not challenge an independent contractor

18  model per se, just one that misclassified workers who are actually employees given Defendant's

19  pervasive right of control over how Drivers carry out their pick-up and delivery duties.  CEVA has

20  made no showing that a different independent contractor model that affords drivers more

21  meaningful operational leeway would be antithetical to the Company's "business model."  Indeed,

22  CEVA's witness on this point, admits such reforms have not even been considered.[13]  The only

23  change that CEVA has actually considered is increasing the amount of pick-up and delivery

24  services assigned to "cartage agent" drivers who currently handle approximately 25 percent of the

25  Company's pick-up and delivery services[14] and  operate with fewer constraints than did the

26

27  [13] DeRobertis-Theye Decl. Ex. Q, Slater 59:8-21, 67:16-69:12, 70:1-71:11.

28  [14] DeRobertis-Theye Decl. Ex. Q, Slater 77:21-78:19.

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

"CEVA branded drivers" that operated under the Agreement here.[15]

Moreover, while CEVA offers testimony from a small sample of drivers who believe they are better off as independent contractors than as employees, it offers little or no factual basis to support such opinions.[16]  Indeed, CEVA offers no factual analysis that shows Drivers' net financial benefit under the prior Agreement surpassed the economic position the Drivers would find themselves in under some alternative business model, such as being reclassified as employees or converted to "agents."[17]  Moreover, the future feasibility of the Company's current independent contractor model could turn on a variety of pressures extraneous to this lawsuit, including findings by the state of California that Drivers should have been treated as employees for tax and unemployment purposes.[18]

To the extent that any Drivers expressed possible opposition to the lawsuit, it was based on a misunderstanding of the lawsuit, such as a belief that a victory for Plaintiffs would necessarily mean that they could no longer own and operate their own trucks for CEVA, but would instead become hourly paid employees.[19]  Several of these Drivers expressed a clear preference for greater

---

[15] The agent's agreements with CEVA afford them significantly more independence than afforded to drivers under the independent contractor Agreement at issue here, including that agents need not follow the same set of policies and procedures as the Drivers, or wear the company uniform. DeRobertis-Theye Decl. Ex. F, Bateman 52:24-53:12, 102:14-103:3, 127:25-128:10.

[16] For example, CEVA cites a study by its expert, Daniel Slottje, purporting to show high "gross revenues" for certain Drivers who used sub-drivers, but Dr. Slottje admitted that he had not calculated the Drivers' *profits*, but only their gross revenue prior to any expenses. *Compare* Opp. at 1:20-2:8, 18:6-15 with DeRobertis-Theye Decl. Ex. R, Slottje Depo. 93:9-17, 94:20-95:2.

[17] Slater admits that CEVA has not studied the economies of any changes to its "asset-light" model that relies on "independent contractor" drivers to provide the beginning and ending (i.e., pick up and delivery) segments of its "freight forwarding" services.  DeRobertis-Theye Decl. Ex. Q, Slater 73:3-7, 93:22-94:12, 112:3-113:9.

[18] DeRobertis-Theye Decl. Ex. S, EGL Petition for Reassessment, CEVA 006251-58.

[19] See Elmore Decl. Ex. A.7 (Dkt. No. 205-2), Estrada 60:18-61:9 (believes successful lawsuit would force him to be an employee); Elmore Decl. Ex. A.9 (Dkt. No. 205-2), Gomez 48:25-49:11 (same); Elmore Decl. Ex. A.28 (Dkt. No. 205-6), Punzalan 53:7-22 (same); Elmore Decl. Ex. A.32 (Dkt. No. 205-6), Wilson 48:17-49:19) (same); Elmore Decl. Ex. A.33 (Dkt. No. 205-6), Yim 54:18-55:9 (same); Elmore Decl. Ex. A.14 (Dkt. No. 205-3), Jones 69:18-22 (does not want court to tell CEVA to convert him from independent contractor to employee); Elmore Decl. Ex. A.18 (Dkt. No. 205-4), Minchez 64:15-19 (same); Elmore Decl. Ex. A.25 (Dkt. No. 205-5), Peters 55:25-56:11 (believes successful lawsuit might determine "that it's illegal for CEVA to have contractor drivers as opposed to employee drivers").

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

independence in carrying out their duties—a possible side-benefit resulting from this lawsuit.[20] Moreover, even if CEVA had shown that some class members have a well-founded basis for opposing this lawsuit, not based on a misunderstanding of what it might accomplish, it has failed to show such divergent views are widespread. CEVA cites conclusory deposition testimony from 17 drivers—approximately four percent of the class—most of whom do not even say that they oppose the lawsuit. Opp. at 20:3-10 & nn. 152-155. In comparison, in *Spencer v. Beavex*, the court held that a desire to remain as independent contractors expressed in declaration testimony from less than ten percent of the class did not "suffice to defeat class certification on the basis of adequacy of representation." 2006 WL 6500597, *13.

Finally, potential antagonism between Plaintiffs and those who may not support the lawsuit is eliminated by the Drivers' option to opt out of the class. *Lerwill*, 582 F.2d at 512 (right to opt out satisfied any potential conflict raised by some putative class members' opposition to lawsuit). The possibility that there may be such opt outs "does not mean that the interests of the named plaintiffs are antagonistic to those . . . who choose to remain a part of the class, which is the relevant inquiry." *Hart v. Rick's Cabaret Int'l Inc.*, 2010 WL 5297221, *6 (S.D. N.Y. Dec. 20 2010).[21]

### 2. The Antitrust Cases Relied Upon By CEVA Do Not Demonstrate Any Conflict Of Interest Here, Where Drivers' Uniform Misclassification As "Independent Contractors" Gives Rise To The Same Injuries And Remedies.

CEVA's argument that Plaintiffs are inadequate representatives because the class may contain members with allegedly opposing interest also fails because all Drivers experienced similar wage and hour violations arising from their uniform "independent contractor" misclassification. CEVA's opposition rest on a string cite of cases rather than analysis. *See* Opp. 27:14-26. Most of these cases are inapposite antitrust suits involving alleged anti-competitive sales and purchasing

---

[20] DeRobertis-Theye Decl. Ex. H, Cunningham 93:5-94:9; DeRobertis-Theye Decl. Ex. I, Douangboupha 56:13-23; DeRobertis-Theye Decl. Ex. K, Jaimez 52:3-22; DeRobertis-Theye Decl. Ex. N, Pereira 79:11 – 80:10.

[21] In *Hart* the court certified a class of adult entertainers claiming to be misclassified as independent contractors despite affidavits from several entertainers disapproving of the lawsuit.

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

schemes, where courts found a conflict of interest existed because the challenged business practices injured some putative class members while benefiting others.  *See Valley Drug Co.  v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (regional drug wholesaler complaining of agreements to limit supply of cheaper generic version of name brand drug was not adequate class representative for a class that consisted of national wholesalers who likely made more money selling the name brand version than the generic version); *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280-81 (11th Cir. 2000) (cattle producers alleging economic harm from defendant beef processors' unlawfully discriminatory program of entering into "forward contracts" with certain producers were in conflict with those producers who benefited from the "forward contracts"); *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group, L.P.*, 247 F.R.D. 156, 177-78 (C.D. Cal. 2007) (conflict between small and large hospitals buying medical devices from defendant manufacturer, because they would be affected differently should a court find two of defendants' pricing mechanisms are prohibited by antitrust laws).

Moreover, courts in this district and elsewhere have rejected the reasoning in the Eleventh Circuit's *Valley Drug*, in which the court found a potential conflict because a sub-population of buyers who suffered an overcharge—the alleged antitrust violation—may have passed on those overcharges to their customers and thereby benefitted from the antitrust violation. Most courts have found that where class members can show they share the same type of antitrust injury—such as purchasers suffering an overcharge—it is irrelevant that some in the class may have also benefited from defendants' conduct.  *See Meijer, Inc. v. Abbott Laboratories*, 251 F.R.D. 431, 436 (N.D. Cal. 2008); *Braintree Laboratories, Inc. v. McKesson Corp.,* 2011 WL 5025096, *1-2 (N.D. Cal. Oct. 20 2011) ; *In re Wellbutrin SR Direct Purchaser Antitrust Litigation*, 2008 WL 1946848, *6 (E.D. Pa. May 2, 2008); *Meijer, Inc. v. Warner Chilcott Holdings Co., III, Ltd.*, 246 F.R.D. 293, 304 (D.D.C. 2007).

The reasoning in *Valley Drug* is similarly unpersuasive when applied to the present lawsuit. All Drivers were classified as independent contractors under the same Agreement.  Therefore, all Drivers were denied the benefits of California's Labor Code, including the right to be reimbursed

1    for business expenses and paid overtime and minimum wage.  That some Drivers speculate they

2    earned more money under the independent contractor label than they would have as employees

3    does not change the fact that they have suffered the same damages as a result of the Company's

4    misclassification as have the Named Plaintiffs and other Drivers.

5          The two other cases relied on by the Company—*Broussard v. Meineke Discount Muffler*

6    *Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998) and *Phillips v. Klassen*, 502 F.2d 362 (D.C. Cir. 1974)—

7    are not availing either, as here there are no incurable conflicts in class members' respective

8    remedial interests such as those that divided the putative classes in those matters.  In *Broussard*,

9    former franchisees represented both current and former franchisees in a non-opt out, Rule 23(b)(2)

10    class arising from allegations that the franchisor had not fulfilled its contractual advertising

11    obligations.  The Fourth Circuit found that there was an irreconcilable conflict of interest between

12    many of the current franchisees and the plaintiffs who were no longer franchisees.  The current

13    franchisees had already settled and released their damages claims, and could only seek restitution;

14    however, the plaintiffs had waived restitutionary relief for the entire class in order to pursue

15    damages.  Thus, because of the (b)(2) certification, a subset of the current franchisees were bound

16    by plaintiffs' choice of remedy and were foreclosed from any relief at all.  *Id.* at 349.  Similarly, in

17    *Phillips*, an irreconcilable conflict arose from plaintiffs' challenge to a reduction-in-force program

18    that extended early retirement benefits and bonuses to Postal Service workers because, if

19    successful, the case could expose some members to legal liability to repay the bonuses.  *Id.* at 367.

20    Here, by contrast, Plaintiffs seek an opt out class under Rule 23(b)(3) that will offer the same back

21    pay, expense reimbursement, and other restitution to all those who elect not to opt out.

22          Finally, CEVA offers no authority to support its contention that some Plaintiffs' status as

23    former drivers disqualifies them from representing CEVA's current drivers.  Courts facing similar

24    circumstances have allowed a company's past service providers to represent those still with the

25    company—particularly when all share in the same types of damages claims and no injunctive or

26    declaratory relief is sought.  *See, e.g., Dalton*, 270 F.R.D. at 560 (rejecting defendant's argument

27    that "because several of the class members prefer the freedom of being an independent contractor,

28

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

1  those named plaintiffs who are no longer employed by Defendant are not adequate

2  representatives"); *Phelps v. 3PD, Inc.*, 261 F.R.D. 548, 558 (D. Or. 2009) (former drivers who

3  alleged they had been misclassified as independent contractors could adequately represent current

4  drivers, especially as plaintiffs did not seek certification of injunctive or declaratory relief claims);

5  *In Re Fed Ex,* 273 F.R.D. at 458 (rejecting argument that plaintiffs, who were mostly former pick-

6  up and delivery drivers, lacked sufficient interest in injunctive relief claim premised on drivers

7  being misclassified as independent contractors under California law).

8        Any divergent interests between former and current drivers is even more attenuated here, as

9  current drivers are now operating under a new contract that falls outside the class period.  Thus,

10  whether Drivers can continue to operate as independent contractors for CEVA—be it under the

11  new contract or some other contract that permits greater independence—is not put at issue by the

12  class claims here.  *See Lerwill*, 582 F.2d at 512 (no conflict where contract had expired, such that

13  employees no longer confronted with choice of waiving contractual terms to enforce rights—

14  "[i]nstead, the choice that they had was to assert their claim for payments or to relinquish it, and in

15  this instance we presume that it was in the general class interest to assert these rights.").

16

17            **3.  Plaintiffs' Damages Models Do Not Defeat Adequacy.**

18            **a)  Plaintiffs Propose Plausible Damages Models For Their Expense**
              **Reimbursement Claims That Will Fairly Compensate All Class**

19                **Members.**

20        Defendants' arguments based on Plaintiffs' expense reimbursement damages models under

21  Labor Code § 2802 are wrong factually and legally.  It is not true that "Plaintiffs seek to substitute

22  a formula for proof of actual expenses," or that "Plaintiffs have chosen to disavow recovery for

23  certain substantial damages."  Opp. at 28:12-3, 29:3-4.  As set forth in the opening brief, Mot. at

24  31-32, Plaintiffs are prepared to prove § 2802 damages through either individual proof of each

25  Drivers' expenses or the mileage reimbursement method, both of which are permissible under

26  California law. *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal.4th 554, 568-70 (2007).[22]  Both are

27  _____

    [22] Defendants incorrectly contend that "In a case claiming reimbursement of expenses, the use of a
formula is inappropriate when damages are capable of exact proof."  Opp. at 31, *citing Estrada*,

28  154 Cal.App.4th 1, 20 (2007).  But *Estrada* was decided on August 13, 2007, and the California

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

workable methods.  For example, a California trial court, with the assistance of a court-appointed referee, used the actual expense method to determine damages for 209 truck drivers who had been improperly classified as independent contractors.  *Estrada v. FedEx Ground Package Systems, Inc.*, 154 Cal. App. 4th 1, 14, 20-21 & nn. 18-19 (2007).  The class here contains 396 drivers, and some, but not all, expenses are contained in Company records (some of which are available electronically) which can be supplemented, as in *Estrada*, by documents maintained by class members.[23]  Even using the actual expense model, individual *testimony* would not be required; at most, the actual expense method of calculating damages would require examination and compilation of documents with respect to 396 Drivers.

Plaintiffs alternatively propose to use the mileage reimbursement method for vehicle-related expenses, which will both simplify the damages phase trial and aid individual drivers, many of whom may no longer have records of actual expenses dating back to 2001 to supplement the records maintained by the Company.  Van drivers will be reimbursed at the IRS mileage rate, which was specifically approved by the California Supreme Court in *Gattuso*.  Mot. at 31:18-21.  Accordingly, none of Defendants' complaints about the mileage reimbursement rate apply to the 86 van drivers.  Plaintiffs' expert Dr. Belzer identified several different methods for arriving at a reasonable mileage reimbursement rate for larger vehicles (which cost more to operate), one of which involves increasing the standard IRS rate by a specified percentage, and one of which involves creating a rate by examining Company documents and publicly available sources such as historic fuel charges.[24]  Neither method waives substantial damages, but instead provides an accurate alternative mechanism for approximating vehicle-related expenses, which is all that the law requires, particularly when it is the employer who has violated its legal duty to maintain

---

Supreme Court issued its opinion allowing use of *either* the mileage reimbursement method or the actual expense model on November 5, 2007.  *See Gattuso*, 42 Cal.4th at 568-570.

[23] One of the largest expenses is fuel, for which Drivers would need receipts.  There should be Company records for many other expenses, including insurance, maintenance, uniforms, and Nextel devices.  DeRobertis-Theye Decl. Ex. F, Bateman 254:12-255:17 (electronic records kept of pay deductions for insurance, radio, uniform); DeRobertis-Theye Decl. Ex. T, Stipulation re: Use of Written Responses In Lieu of Testimony.

[24] Dungan Decl. Ex. G1 (Dkt. No. 181), Belzer Report ¶¶14-34.

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

adequate records of expense reimbursement.  *Cf. Gattuso*, 42 Cal.4th at 573 (statutory scheme implicitly requires that employers provide some method to determine amount of compensation intended as expense reimbursement); *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 688 (1946) (court should accept employee's reasonable approximation of wage loss where employer failed to meet its obligation to keep accurate records); *Hernandez v. Mendoza*, 199 Cal. App.3d 721, 726-28 (1988) (same).

As CEVA acknowledges, Plaintiffs need not show at the class certification stage that their damages "methods will work with certainty."  They need only "come forward with plausible statistical or economic methodologies."  Opp. at 31.  The very fact that the IRS has a standard reimbursement rate that has been approved by the California Supreme Court for use in calculating § 2802 reimbursement shows that calculation of a standard mileage reimbursement rate for vehicle related expenses is plausible.  The analysis should end there.  Nevertheless, a quick review exposes the weaknesses in CEVA's challenges to Plaintiffs' mileage reimbursement rate methods:

1.     CEVA's argument that using a "mileage rate modeled after the IRS rate" to calculate reimbursable expenses "would be inappropriate" because "a universal mileage rate . . . is inappropriate when an owner operator owns (rather than leases) his vehicle and claims depreciation" rests on a misreading of an IRS press release.  Opp. 31-32.[25]  The IRS rate is expressly designed to account for costs of operating vehicles that taxpayers "*own or lease*."  Rev. Proc. 2010-51, 2010-51 I.R.B. 883 §3.01 (emphasis added); *see also id.* §4.02 (single IRS "standard mileage rate" accounts for "fixed and variable costs" of vehicles including either "depreciation or lease payments"); *id.* §4.04 ("If a taxpayer uses the business standard mileage rate … a per-mile amount . . . *is treated as depreciation* for those years in which the taxpayer used the

---

[25] The subject press release states that a taxpayer may not rely on the business standard mileage rate to substantiate a claimed *tax deduction* for a vehicle "*after* using any depreciation method under the Modified Accelerated Cost Recovery System (MACRS) or *after* claiming a Section 179 deduction for that vehicle."  *IRS Announces 2012 Standard Mileage Rates, Most Rates Are the Same as in July*, Dec. 9, 2011, http://www.irs.gov/newsroom/article/0,,id=250882,00.html (emphases added) (cited at Opp. 32 n.172).  This press release paraphrases the rule (not relevant here) that a taxpayer may not claim a tax deduction using the standard mileage rate *and also* claim depreciation of an automobile as a *separate* deductible business expense, because the standard mileage rate already accounts for depreciation.  *See* Rev. Proc. 2010-51 §4.05(3).

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

business standard mileage rate." (emphasis added)). Accordingly, the court in *Gattuso* recognized that the IRS standard mileage rate provides an appropriate method for calculating reimbursement for vehicle expenses, including "depreciation . . . (or lease costs)." 42 Cal.4th at 568-69.

2. CEVA wrongly contends that, using the mileage reimbursement rate proposed by Plaintiffs in their Seventh Supplemental Disclosures, one Named Plaintiff would receive substantially more than his expenses calculated by the "actual" reimbursement method, while another Named Plaintiff would receive less. Opp. at 32-33. This conclusion is based primarily on computational and other factual errors.[26] When these errors are corrected, the mileage reimbursement rate provides a fairly close approximation of the actual expenses claimed by the two Named Plaintiffs.[27] Further, once non-vehicle related expenses are added to the mileage reimbursement calculation (which is intended to cover only the costs of operating a vehicle), the reimbursement rates are nearly equivalent.[28] The mileage reimbursement rate used in Plaintiffs' Supplemental Disclosures is only an initial estimate prepared by Plaintiffs' *counsel*; Plaintiffs' *expert* is not yet required to have, and has not, completed his formulation of the precise mileage reimbursement rate to be used.[29] Defendants have not demonstrated either that the mileage reimbursement rate is unworkable, or that it will fail to adequately compensate class members.

3. CEVA also wrongly conflates IRS and Labor Code § 2802 standards in an attempt to "illustrate" that Plaintiffs' mileage reimbursement rate will leave "substantial expenses unreimbursed" by comparing Plaintiff Iheonu's IRS Schedule C's business expenses to the damages calculated in his initial disclosures. Opp. at 21, 33 n.178. The IRS standard for determining whether a business expense is deductible is distinct from–and in some respects more lenient than–the Labor Code § 2802 standard for determining which expenses must be reimbursed

---

[26] *See* DeRobertis-Theye Decl. ¶¶4-9.

[27] DeRobertis-Theye Decl. ¶10.

[28] DeRobertis-Theye Decl. ¶11.

[29] *See* Seventh Amended Disclosures at 3 ("The methods for calculating each category of damages and the amounts sought in each category will be the subject of expert testimony. The estimates provided in this amended supplemental disclosure represent Plaintiffs' *counsel's* best estimates using the information currently available") (emphasis added); *id.* at 5.

by an employer.  *Compare* 26 U.S.C. §162(a) (tax deductions permissible for "all the ordinary and necessary expenses paid or incurred . . . in carrying on any trade or business"); *Palo Alto Town & Country Village, Inc. v. C.I.R.*, 565 F.2d 1388, 1390 (9th Cir. 1977) (§162(a) permits deductions for any expense "that is normally to be expected, in view of the circumstances facing the business," and "is appropriate and helpful to the business") *with* Cal. Labor Code §2802(b) (reimbursement required only for "necessary expenditures or losses incurred by the employee in *direct consequence of the discharge of his or her duties*, or of his or her obedience to the *directions of the employer*" (emphases added)); *Stuart v. RadioShack Corp.*, 641 F.Supp.2d 901, 903 (N.D. Cal. 2009) (expense reimbursable under §2802 only if "employer either knows or has reason to know that the employee has incurred a reimbursable expense").  Accordingly, the court in *Gattuso* observed, "section 2802 does not require an employer to use a reimbursement method that is congruent with any tax law or has any particular tax consequence." 42 Cal. 4th at 571.  Plaintiffs seek reimbursement for expenses incurred as a "direct consequence of the discharge" of the Drivers' duties, and which CEVA knew Drivers incurred, because, under the CEVA-imposed Agreement, the Drivers were explicitly *required* to bear the expenses at issue here.  Such a causal relationship between the expense claim and the employees' work responsibilities is not required for tax deduction purposes.  *See Stemkowski v. C. I. R.*, 690 F.2d 40, 47 (2d Cir. 1982) ("[A] requirement by an employer that an employee make an expenditure . . . is not a prerequisite for [claiming a business expense] deduction.").  That the tax code may have permitted Plaintiff Iheonu to claim deductions for expenses like legal and professional services, meals and entertainment, or advertising—expenses that are not directly related to CEVA-mandated duties and instructions— does not mean that such expenses are reimbursable under § 2802.[30]

---

[30] To the extent the Court determines that certain expenses, like labor costs for helpers, *are* properly reimbursable under §2802 (as Defendants seem to suggest, *cf.* Opp. 21, 33 n.178; McAlpine Decl. ¶¶6-12), Plaintiffs can readily amend their supplemental disclosures to capture such expenses.  *See* Belzer 60:23-65:16 (expert capable of analyzing labor costs but did not do so because instructed by counsel this was not element of damages).  There is no question that Drivers were not *required* to hire sub-drivers.  The only other expense arguably excluded from Dr. Belzer's analysis is tolls.  *See* Opp. at 28:19-29:1 (citing Belzer deposition testimony that tolls might be excluded).  Tolls are hardly "substantial" damages in light of the alternatives of either forgoing class treatment or requiring drivers to locate expense records dating back to 2001.

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

4.      While CEVA attacks Dr. Belzer's expertise and speculates about potential flaws in his proposals for calculating a mileage reimbursement rate, Opp. at 33-35, it cannot seriously dispute that he will be able to arrive at a set of reliable mileage reimbursement rates for the three types of vehicles at issue here.  After all, the IRS establishes such a rate for cars, vans, and pick-up trucks, and several private companies study and devise appropriate standard mileage rates for reimbursing employees for work-related mileage on their vehicles.[31]  In any case, CEVA's criticism of Belzer's work is severely flawed.  For example, CEVA argues that the only way to develop a mileage rate is to "obtain fuel receipts from a sample of drivers who kept such records." Opp. at 33.  But Belzer explains that the historic cost of fuel is available from public sources, and that fuel mileage for various classes of vehicles is consistent across those classes.[32]  Similarly, CEVA describes alleged flaws in "sample" and "survey" methodology, despite the fact that Belzer is unlikely to use such methods, as he has proposed two other potential methods that rely on the IRS published rate, CEVA's own documents, and publicly available sources.[33]  Finally, such attacks on expert methodology can be more fairly evaluated closer to or at trial, after damages discovery has been conducted and Plaintiffs' expert has completed his analysis.

### b)  Plaintiffs' Choice Of Damages Models Does Not Create A Conflict.

As described above, Plaintiffs are not waiving any category of damages in an effort to obtain class certification, but propose to use *either* the actual expense method (if the Court so orders) *or* the mileage reimbursement method, which will be beneficial to the vast majority of Drivers who may no longer possess all of their actual expense records dating back to 2001.[34]  In

---

[31] *See* DeRobertis-Theye Decl. ¶12.

[32] Dungan Decl. Ex. G1 (Dkt. 181), Belzer Report ¶28.

[33] Dungan Decl. Ex. G1 (Dkt. 181), Belzer Report ¶¶14-30.

[34] CEVA faults Plaintiffs for not seeking reimbursement of expenses incurred on or after October 17, 2011.  Opp. at 28 n. 166.  But CEVA entered into a new contract with its drivers on that date, and the drivers' employment status under the terms of that new contract is not an issue in this lawsuit, as to which the class period will close the prior day.  Mot. at 1 n.1.  Drivers under the new contract are not precluded from bringing any claims they may wish to bring with respect to that new contract, whether or not a class is certified here with respect to the previous contract and time period.  Accordingly, the failure to seek reimbursement of expenses incurred on or after October 17, 2011, does not render Named Plaintiffs inadequate representatives for the class sought to be certified, which includes only time worked under the prior contract.

1    any case, CEVA's attack on Plaintiffs' adequacy for supposedly waiving certain expense

2    reimbursements is meritless, as class representatives may legitimately waive certain damages in

3    order to achieve class-wide relief.

4           As the Seventh Circuit has explained, unless a named plaintiff is waiving damages that are

5    "large in relation to" the damages sought in the class action lawsuit, "a representative plaintiff must

6    be allowed to forgo claims for compensatory damages in order to achieve class certification."

7    *Murray v. GMAC Mort. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006) (named plaintiff sought statutory

8    damages under Fair Credit Reporting Act ("FCRA") but did not pursue actual compensatory

9    damages). Many district courts, including this District, are in accord. *See, e.g., Brzychnalski v.*

10   *Unesco, Inc.* 35 F. Supp.2d 351, 353 (S.D.N.Y. 1999) (plaintiffs in wage and hour case may waive

11   state liquidated damages not available in class actions in order to obtain class certification);

12   *Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 87, 94-95 (S.D.N.Y. 2001) (same);

13   *White v. E-Loan, Inc.*, 2006 WL 2411420, *2-3 (N.D. Cal. Aug. 18, 2006) (FCRA); *Chakejian v.*

14   *Equifax Information Servs.*, 256 F.R.D. 492, 499-500 (E.D. Pa. 2009) (FCRA).

15          Particularly where certain damages or claims may be difficult to prove or certify, it is not

16   the court's place to second guess litigation strategy. *Chakejian*, 256 F.R.D. at 500 n.4; *In Re*

17   *Conseco Life Ins. Co. Lifetrend Ins. Sales and Marketing Litigation*, 270 F.R.D. 521, 531-32 (N.D.

18   Cal. 2010). Here, there is a serious legal question whether labor costs are recoverable under §

19   2802, and Plaintiffs' Counsel has made a reasonable litigation decision not to seek such damages.

20   To the extent any individual class member does not want to forgo the possibility of claiming those

21   additional damages, that class member may opt out. *Murray*, 434 F.3d at 953; *Brzychnalski*, 35 F.

22   Supp.2d at 353; *Chakejian*, 256 F.R.D. at 500.

23          Defendants' cases are not to the contrary. In *Thompson v. American Tobacco Co., Inc.*, 189

24   F.R.D. 544 (D. Minn. 1999), the court found plaintiff smokers inadequate because they brought

25   claims only for medical monitoring and smoking cessation programs, and class certification of

26   those claims might have precluded class members from bringing far more valuable personal injury

27   claims against the tobacco companies. *Id.* at 550-51. Plaintiffs here have not waived any claims.

28

- 22 -

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

In *Kelecseny v. Chevron, U.S.A. Inc.*, 262 F.R.D. 660 (S.D. Fla. 2009), the court found plaintiff

inadequate for having abandoned 15 of the 16 types of damages initially claimed in the complaint.

*Id.* at 672-73. Here, in contrast, Plaintiffs have a plan for seeking all legally cognizable damages.[35]

**E.      Class Treatment of the Expense Reimbursement Claim Is Superior To Hundreds Of Individual Trials All Examining The Same Core Evidence Regarding Employment Status.**

In arguing that purported difficulties in determining damages for Plaintiffs' § 2802 claims

defeat predominance and superiority, CEVA once again ignores the law and the facts.[36] As

explained above, controlling California state law allows Plaintiffs to prove vehicle-related

damages—the lion's share of the expense reimbursement claim—by using the mileage

reimbursement method, which allows damages to be established for the class based on CEVA

documents and expert testimony alone. *See supra*, pp. 16-17. And as also explained above, such a

mileage reimbursement rate already exists for van drivers (the IRS rate approved by the California

Supreme Court) and can easily be derived by an expert with respect to larger trucks. *See supra* at

pp. 17-18.  The other, smaller ticket items should in large part be provable through CEVA records.

A class action, in which Plaintiffs have the combined resources to retain an expert to calculate a

mileage reimbursement rate that can be applied to mileage records maintained by CEVA, is

certainly more manageable, and superior to, a series of individual actions in which each Driver

must individually prove damages through CEVA records and receipts of expenses dating back to

---

[35] As noted above, a class member can always opt out if he is not satisfied with the scope of relief sought.  The right to opt out did not solve the problem in *Kelesceny* only because numerosity was already questionable, and "if all potential class members with any of the [abandoned] damages…were to opt out, there could be very few individuals left to certify as a class." *Id.* at 673. Here, even if all Drivers with substantial labor costs were to opt out (which is doubtful), there would still be hundreds of drivers in the class. *See* Bateman Decl. (Dkt. 206) at ¶¶3, 5 (out of 396 putative class members, 125 retained one or more subdrivers or permanent helpers).

[36] Defendants do not seriously contest Plaintiffs' ability to prove class-wide damages for their other claims.  *Cf.* Opp. at 34-5, n. 179 (complaining that Plaintiffs' expert Professor Lewin has not settled on any particular methodology for computing damages for minimum wage, overtime, and meal period damages, without alleging that such damages cannot be manageably computed).  As explained in Plaintiffs' opening brief and in Dr. Lewin's Expert Report, such damages can be computed in part by reference to driver time logs, sign-in sheets, and other CEVA documents. Mot. at 31. And to the extent CEVA did not keep accurate time records in violation of California law, even "imprecise evidence by the employee can provide a sufficient basis for damages." *Hernandez*, 199 Cal.App.3d at 726-28; *see also Mt. Clemens*, 328 U.S. at 688.

2001 (which may have been lost or destroyed in the intervening years), and also individually prove the core employment status liability issue, which should be adjudicated only once, based on common evidence.

But even if the 396 class members were each required to prove actual expenses, that would not defeat class certification. It is binding Ninth Circuit law that "[i]n this circuit, however, damage calculations alone cannot defeat certification." *Yokoyama v. Midland Nat'l. Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010) (discussing both predominance and superiority, and reversing district court's denial of class certification that had been based in part on the "district court's misinterpretation of…this circuit's precedent regarding the significance of individualized damages calculations in the context of class certification"). Even though "[t]he amount of damages is invariably an individual question [this fact] does not defeat class action treatment." *Id.* at 1094.

And even if this Court determines that the actual expense method must be used here, a class action would still be superior. "The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case…. This determination necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1023 (9th Cir. 1998) (citation omitted). Here, the choices are either a class case in which the employment status of Drivers working under the exact same contract and policy and procedures manual is decided one time by one jury, or multiple individual lawsuits addressing the same liability issues, with the exact same evidence. In either case, individual damages under the actual expense method would need to be calculated based on company documents and documents within the possession of the class members. Class treatment is a superior method for resolving this dispute for all 396 Drivers.[37]

Defendants' cases do not require a different result. For example, the district court in *Harris*

---

[37] At the very least, the core issue of employment status should be certified under Rule 23(c)(4)(A). *See McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,___F.3d___, 2012 WL 592745, *8 (7th Cir. Feb. 24, 2012) (where core liability issue can be decided based on common evidence, Rule 23(c)(4)(A) certification is appropriate, even if other issues must then be individually tried); *In re: Nassau County Strip Search Cases*, 461 F.3d 219, 225 (2nd Cir. 2006) (district court abused its discretion in failing to consider liability issue certification under Rule 23(c)(4)(A)); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 441 (4th Cir. 2003) ("courts should take full advantage of the provision in subsection (c)(4) permitting class treatment of separate issues in the case").

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

*v. Vector Marketing Corp.*, 753 F.Supp.2d 996, 1022-23 (N.D. Cal. 2010) denied class certification in an independent contractor/employee misclassification case, in part because in that case "determining the necessity of the variety of expenses incurred by [plaintiff] Sales Representatives appears to involve qualitative as well as quantitative analysis, not a 'straightforward calculation.'" In that case, there was "substantial variance as to what kind of expenses were even incurred by Sales Representatives"—some may have taken the bus whereas others used a car; some may have used a personal cell phone whereas others may have used the defendant's office phones; and some may have purchased clothing while others did not. *Id.* at 1022-23. Here, in contrast, all of the expenses sought were *required* under the Agreement. *See* Mot. at 15. And the unpublished decision in *Sepulveda v. Wal-Mart Stores, Inc.*, 2011 WL 6882918 (9th Cir. Dec. 30, 2011) is totally inapposite. There, the court found only that class certification was not appropriate under Rule 23(b)(2), because individualized damages issues demonstrated that "the monetary relief sought was not incidental to the injunctive relief sought." *Id.* at *1. Here, Plaintiffs seek certification under Rule 23(b)(3), where controlling Ninth Circuit law is that individualized damages issues cannot defeat class certification. *Yokoyama*, 594 F.3d at 1094.

### III.     CONCLUSION

For the reasons set forth in Plaintiffs' opening brief and above, the class and subclasses should be certified.

Dated:  March 16, 2012          By:      /s/ Aaron Kaufmann
                                         Aaron Kaufmann, SBN 148580
                                         David Pogrel, SBN 203787
                                         LEONARD CARDER, LLP

Dated:  March 16, 2012          By:      /s/ Eve Cervantez

                                         Michael Rubin, SBN 80618
                                         Eve Cervantez, SBN 164709
                                         Matthew J. Murray, SBN 271461
                                         ALTSHULER BERZON LLP
                                         *Attorneys for Plaintiffs*

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION